UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
SUZANNE SINCLAIR,             )
                              )
              Plaintiff,      )
                              )      CIVIL ACTION
         v.                   )      NO. 16-10875-WGY
                              )
NANCY A. BERRYHILL,           )
Acting Commissioner, Social   )
Security Administration,      )
                              )
              Defendant.      )
                              )
```

YOUNG, D.J.                                    July 21, 2017

**MEMORANDUM & ORDER**

## I.   INTRODUCTION

Suzanne Sinclair ("Sinclair") brings this action pursuant
to the Social Security Act, 42 U.S.C. § 405(g), appealing the
final decision of the Acting Commissioner of Social Security
("Commissioner"),[1] denying disability insurance benefits and
supplemental security income (collectively, "disability
benefits").  Compl. ¶ 1, ECF No. 1.  Sinclair alleges that
substantial evidence does not support the hearing officer's[2]

---

[1] Nancy A. Berryhill is now the Acting Commissioner of the
Social Security Administration, and thus substituted for Carolyn
W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

[2] For an explanation of the Court's use of the term "hearing
officer," see Vega v. Colvin, 164 F. Supp. 3d 249, 251 n.1 (D.
Mass. 2016).

decision, and the Commissioner's subsequent affirmation of that denial constitutes legal error.  Id. ¶ 3.

Specifically, Sinclair contests: (1) the Social Security Administration Appeals Council's ("Appeals Council") finding that she did not have a medically determinable fibromyalgia impairment, (2) the residual functional capacity determination, and (3) the step-five conclusion that Sinclair could perform other work.  Mot. Reverse (Incorporated Mem. Law) ("Pl.'s Mem.") 5, 14, ECF No. 14.  The Commissioner argues that substantial evidence supports the Appeals Council's conclusions, and thus asks this Court to affirm the decision.  Mem. Law Supp. Def.'s Mot. Affirm Commissioner's Decision ("Def.'s Mem.") 1, ECF No. 17.  For the reasons explained below, the Court remands this matter for further proceedings.

**A.  Procedural History**

On November 9, 2012, Sinclair applied for disability insurance benefits, Administrative R. ("Admin. R.")[3] 226-29, and supplemental security income, id. at 230-40.  Sinclair's applications were initially denied on February 12, 2013, id. at 120-21, and again upon reconsideration on June 10, 2013, id. at

---

[3] Because the administrative record spans multiple docket entries, labeled ECF Nos. 10-1 through 10-11, this memorandum cites to the continuously paginated record and omits references to specific ECF numbers.

148-55, 163-68.  At Sinclair's request, a hearing was held on
June 17, 2014.  Id. at 82-83.  In addition to Sinclair's
testimony, id. at 44-70, the hearing officer elicited testimony
from a vocational expert, id. at 70-77.  Then, in a written
decision issued on September 26, 2014, the hearing officer found
that Sinclair is not disabled.  Id. at 11-35.

On November 24, 2014, Sinclair requested that the Appeals
Council review the hearing officer's decision.  Id. at 9-10.  In
anticipation of the Appeals Council's review, Sinclair
supplemented the record with an affidavit from a vocational
expert, David Meuse ("Meuse").  Id. at 359-63.  On March 17,
2016, the Appeals Council upheld the hearing officer's decision
and issued the Commissioner's final decision denying Sinclair
disability benefits.  Id. at 1-8.

On May 13, 2016, Sinclair filed a complaint in this Court
seeking judicial review of the Commissioner's denial.  Compl.
The Commissioner filed an answer, Answer, ECF No. 11, and the
administrative record on September 23, 2016, Admin R.  Sinclair
subsequently moved to reverse the Commissioner's decision.
Pl.'s Mem. 1.  On January 13, 2017, the Commissioner filed a
motion to affirm the Commissioner's decision and a supporting
memorandum.  Def.'s Mot. Affirm, ECF No. 16; Def.'s Mem. 1.
Sinclair responded to the Commissioner's motion on February 27,
2017.  Pl.'s Resp. Def. Commissioner's Mot. Affirm ("Pl.'s

Resp."), ECF No. 23.  On March 10, 2017, this Court heard oral arguments[4] and took the matter under advisement.  Electronic Clerk's Notes, ECF No. 25

### B.  Factual Background

Sinclair was born on November 18, 1967.  Admin. R. 226, 230.  She worked as a tissue paper packer, id. at 22, 49, 354-55, until April 15, 2007, when she was laid off, id. at 50-51, 226, 230, 257.  Sinclair contends that the disabling effects of her impairments contributed to her stopping work.  Id. at 257.

She alleges that she suffers from a number of debilitating conditions: degenerative changes of the lumbar, thoracic, and cervical spine; radiculopathy; fibromyalgia; plantar fasciitis; migraine headaches; gastroesophageal reflux disorder; carpal tunnel syndrome; shoulder impairment; and obesity.  Id. at 257, 355-56; Pl.'s Mem. 1.

The record includes opinions from Sinclair's treating physicians, Dr. John Harrington ("Dr. Harrington"), Admin. R. 562-63, and Dr. Danilo Funa ("Dr. Funa"), id. at 853-56.  Dr. Harrington described Sinclair's limitations generally: "She finds it very difficult . . . to get around due to her back pain."  Id. at 562.  Dr. Funa completed a Medical Source

---

[4] This Court has commenced giving oral hearings in Social Security cases.  See Mauro King v. Berryhill, No. 15-00285-WGY, 2017 WL 1753442, at *1 n.5 (N.D.N.Y. Apr. 14, 2017), for an explanation of this change.

Statement of Ability to Do Work-Related Activities (Physical) form.  Id. at 853-56.  As Dr. Funa's opinion is particularly significant to Sinclair's appeal, the Court discusses this assessment in detail.

Dr. Funa checked boxes on the Medical Source Statement form to indicate the functional implications of Sinclair's maladies. Based on those answers, Dr. Funa opined that Sinclair could lift or carry less than ten pounds frequently and up to ten pounds occasionally.  Id. at 853.  Dr. Funa reported that Sinclair could stand or walk for less than two hours in an eight-hour work day.  Id.  He also indicated that Sinclair's condition(s) required her to alternate periodically between sitting and standing.  Id. at 854.  Due to shoulder pain, Sinclair had limited ability to push or pull with her upper extremities.  Id. Dr. Funa marked that Sinclair's manipulative abilities, including reaching overhead, were unlimited.  Id. at 855. Finally, Dr. Funa concluded that Sinclair had no attention or concentration issues.  Id.  Although the form asks physicians to explain and "describe the factors that support" the limitations selected -- specifically when physicians choose the lowest exertional levels for lifting, carrying, standing, and walking -- Dr. Funa did not elaborate on his opinions.  Id. at 853.

## II.   LEGAL STANDARDS

### A.   Standard of Review

This Court is bound to uphold the final decision of the Commissioner regarding disability benefits so long as the Commissioner did not commit legal error and the Commissioner's findings of fact are supported by substantial evidence.   42 U.S.C. § 405(g); see also Manso-Pizarro v. Secretary of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).   Substantial evidence is "more than a mere scintilla [of relevant evidence that] a reasonable mind might accept as adequate to support a conclusion."   Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).

It is the role of the hearing officer, not this Court, "to draw factual inferences, make credibility determinations, and resolve conflicts in the evidence."   Woodie v. Colvin, 190 F. Supp. 3d 242, 246 (D. Mass. 2016) (citing Irlanda Ortiz v. Secretary of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)); see also Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001)("[T]he responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee . . . . It does not fall on the reviewing court." (citation omitted)).   Accordingly, the Court must affirm the Commissioner's decision "even if the record arguably could justify a different conclusion."

<u>Rodriguez Pagan</u> v. <u>Secretary of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987).  Questions of law, however, are subject to de novo review.  <u>Seavey</u>, 276 F.3d at 9.

**B.   Disability under the Social Security Act**

Under the Social Security Act ("Act"), an individual is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Administration conducts a five-step sequential evaluation to determine whether a claimant satisfies the Act's definition of disabled:

> (1) Whether the claimant is engaged in substantial gainful activity;
> (2) Whether the claimant has a severe impairment;
> (3) Whether the impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1, and meets the duration requirement;
> (4) Whether the claimant has the residual functional capacity to perform his past relevant work; and
> (5) Whether the impairment prevents the claimant from doing any other work, considering the claimant's age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920 (4)(i)-(v).  The applicant bears the burden of proof for the first four steps; the burden shifts to the Commissioner at step five.  <u>Bowen</u> v. <u>Yucker</u>, 482 U.S. 137, 146 n.5 (1987); <u>Vega</u> v. <u>Colvin</u>, 164 F. Supp. 3d 249, 256 (D. Mass. 2016).

## III. PRIOR DECISIONS

### A.   The Hearing Officer's Decision

The hearing officer proceeded through the five-step sequential analysis to determine whether Sinclair is entitled to disability benefits. She found that Sinclair was insured through December 31, 2012 and has not engaged in substantial gainful activity since April 2007, the date of alleged disability onset. Id. at 17.  At the second step, the hearing officer found that Sinclair suffers from three severe impairments: degenerative changes of her spine (lumbar, thoracic, and cervical) with radiculopathy, plantar fasciitis, and obesity.  Id.  The hearing officer also acknowledged Sinclair's non-severe impairments: headaches/ migraines, gastroesophageal reflux disorder, and carpal tunnel syndrome, id., but determined that Sinclair does not suffer from a medically determinable impairment of fibromyalgia, id. at 19.  At step three, the hearing officer concluded that Sinclair does not have an impairment, or combination of which, that equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 19-20.

Before continuing to step four, the hearing officer assessed Sinclair's residual functional capacity.  Id. at 20. The hearing officer determined that Sinclair had the residual functional capacity to perform sedentary to light work with the

additional limitation that "she must alter sitting and standing at will." Id. at 20, 23.  The hearing officer found that Sinclair could stand and walk for up to two hours in an eight-hour workday, and carry or lift up to twenty pounds occasionally and ten pounds frequently.  Id. at 20.  The hearing officer also acknowledged that Sinclair could not reach overhead.  Id.  Given Sinclair's residual functional capacity, the hearing officer concluded that Sinclair was unable to perform her past relevant work as a packer.  Id. at 33.

At step five, however, the hearing officer determined that there are other jobs Sinclair could perform.  Id. at 33-34, 72.  The hearing officer explained that a claimant with a functional capacity for the full range of light work would lead to a "not disabled" ruling, but Sinclair's additional limitations required further consideration as to what "other" work she could perform.  Id. at 34.  As such, the hearing officer posed three hypothetical scenarios to the vocational expert.[5]  Id. at 71-75.  All of the hypotheticals accommodated the need to alternate between sitting and standing at will.  Id.  Additionally, each hypothetical individual could frequently lift and carry ten

---

[5] A table is appended for convenience.  All hypotheticals posed to the vocational expert involved an individual who is Sinclair's age (younger), has the same educational background (high school) and past work experience (tissue paper packer).  Admin. R. 71-72.

pounds and occasionally twenty pounds.  Id.  In the first hypothetical, the individual could sit, stand, and walk for six hours, reach overhead occasionally, and climb stairs.  Id. at 72.  According to the vocational expert, an individual with those limitations could be an office helper, information clerk, or inspector.  Id. at 34, 72-73.  All of those positions, the expert explained, are light duty jobs with a specific vocational preparation ("SVP") rating[6] of one or two.  Id. at 72-73.  The vocational expert also supplied job incident numbers based on labor statistics to show that these jobs existed in significant numbers nationally and locally.  Id.

Modifying the first hypothetical to create a second scenario, the hearing officer asked the vocational witness about an individual who could stand or walk for up to two hours, could not reach overhead, could occasionally stoop and climb stairs, but could not crouch or kneel.  Id. at 73.  The vocational expert opined that an individual with these limitations could perform the positions of telephone clerk (DOT 237.367-046),

---

[6] The Department of Labor assigns each job an SVP number, which indicates the amount of training needed to learn that particular job.  SVP ratings range from one to nine; the higher the number, the more training is required.  An SVP rating of two corresponds to unskilled work.  See Social Security Ruling (SSR 00-4p), Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 65 Fed. Reg. 75,759 (Dec. 4, 2000).

office clerk (DOT 205.367-014), or table inspector (DOT 739.687-182), all of which have a sedentary exertional level and an SVP of two. <u>Id.</u> at 74.

The hearing officer ultimately found that Sinclair could do other work as an information clerk, office helper, or inspector, jobs derived from the first hypothetical. <u>Id</u>. at 34. To reach this conclusion, the hearing officer relied on Medical-Vocational Rule 202.20. <u>Id.</u> She also reiterated the vocational expert's testimony that someone with Sinclair's residual functional capacity and additional limitations could perform these light duty positions. <u>Id.</u> Therefore, the hearing officer denied Sinclair disability benefits at step five. <u>Id.</u> at 34-35.

**B.   The Appeals Council's Decision**

Upon reconsideration, the Appeals Council adopted the hearing officer's findings, only departing at step five of the analysis. <u>Id.</u> at 5, 7. Whereas the hearing officer relied only on Medical-Vocational Rule 202.20, the Appeals Council used Medical-Vocational Rules 202.20 and 201.27. <u>Id.</u> at 5. The Appeals Council made this adjustment because Sinclair's residual functional capacity falls between two ranges of work designations (sedentary and light). <u>Id.</u> The Appeals Council confirmed that Sinclair could perform other jobs, but disagreed with the hearing officer about which positions Sinclair could perform. <u>Id.</u> The Appeals Council found that Sinclair could be

[11]

a telephone clerk, office clerk, or table inspector.  Id.  In
deviating from the hearing officer's decision, the Appeals
Council explained that the vocational expert identified those
jobs based on the second hypothetical, which described an
individual who could stand or walk for up to two hours.  Id.

The Appeals Council also considered evidence Sinclair
submitted after her hearing, id. at 6, specifically an affidavit
from Meuse, id. at 360-63.  Meuse contested the vocational
expert's hearing testimony, specifically challenging her
reliance on the Dictionary of Occupational Titles ("Dictionary"
or "DOT") because this job information was last updated in 1991.[7]
Id. at 360.  The Appeals Council dismissed Meuse's criticism of
the DOT, stating that the Social Security Administration
("Administration") takes administrative notice of this
publication.  Id. at 6.

## IV.  ANALYSIS

Sinclair challenges the Commissioner's decision on three
grounds.  First, Sinclair argues that the hearing officer (and
by extension, the Commissioner) incorrectly concluded that her
fibromyalgia was not a medically determinable impairment.  Pl.'s
Mem. 5.  Second, she asserts that the hearing officer failed to

---

[7] Meuse also pointed out that while the Dictionary was updated
in 1991, some job descriptions have not been updated since the
1970s or 1980s.  Admin. R. 360.

accord proper evidentiary weight to the opinion of her treating physician, Dr. Funa.  Id.  Finally, Sinclair contends that the hearing officer's reliance on the vocational expert's testimony was improper.  Id. at 14.  The Court addresses each argument in turn.

### A.   No Medically Determinable Fibromyalgia Impairment

Sinclair asserts that the hearing officer incorrectly concluded that her fibromyalgia was not a medically determinable impairment and the Appeals Council failed to correct that alleged error.  Pl.'s Mem. 5-6.  Sinclair argues that this decision is erroneous because both Drs. Funa and Harrington diagnosed her fibromyalgia.  Id. at 6.  In addition to beating the familiar drum that substantial evidence supports the hearing officer's finding, the Commissioner argues that even if this were error, it is harmless.  Def.'s Mem. 5-7.

A claimant can establish a medically determinable impairment by offering evidence from acceptable medical sources, such as clinical testing, laboratory results, and licensed physicians.  20 C.F.R. § 404.1513(a).  Fibromyalgia, however, presents an additional layer of complexity as this syndrome eludes diagnostic laboratory tests.  See, e.g., Carolyn A. Kubitschek & Jon C. Dubin, Social Security Law and Procedure In Federal Court § 5:71 (Feb. 2017).  While a "diagnosis of fibromyalgia alone does not ensure a finding of disability[,]

[13]

. . . . Federal Courts have taken a broad view on the evidence
that can be used to support a diagnosis of fibromyalgia." Id.
§ 5.72.

Typically, it is improper for a hearing officer to
substitute her own judgment for that of medical professionals.
See Manso-Pizarro, 76 F.3d at 17.  But, given the unique
difficulty involved in establishing fibromyalgia, the hearing
officer "will review the physician's notes to see if they are
consistent with the diagnosis of [fibromyalgia]."  Social
Security Ruling (SSR) 12-2p; Titles II and XVI: Evaluation of
Fibromyalgia, 77 Fed. Reg. 43,640 (July 25, 2012).  To assist in
that evaluation, the Administration identified two methods for
assessing a diagnosis of fibromyalgia.  Id.

The first method, based on the 1990 American College of
Rheumatology Criteria for the Classification of Fibromyalgia
("1990 Method"), requires a person have all three of the
following: (1) "[a] history of widespread pain," (2) at least
eleven positive tender points out of a possible eighteen tender
point sites, and (3) "[e]vidence that other disorders that could
cause the symptoms or signs were excluded."  Id.  Here, the
parties dispute only the second and third criteria.  Pl.'s Mem.
6, 9; Def.'s Mem. 6-7.  As to a tender point examination, Dr.
Harrington's treatment notes report that Sinclair "[s]how[ed]
trigger point tenderness up and down her spine in a symmetric

[14]

distribution.  She has some tenderness anteriorly over the upper
sternum bilaterally and also the medial aspects of her thighs."
Admin. R. 564.  This description, however, does not identify how
many tender points were "positive," meaning the individual
experiences pain when pressure is applied to the site.  SSR 12-
2p n.6.  The Administration's ruling explains that if a
physician's tender-point test "report does not describe the
number and location on the body of the positive tender points,"
then the hearing officer can use the factors outlined in the
2010 American College of Rheumatology Preliminary Diagnostic
Criteria.  Id.

    The "2010 Method" is the second method available to
establish a medically determinable fibromyalgia impairment.  Id.
The 2010 Method incorporates the first and third requirements
outlined in the 1990 Method, but differs as to the second
criterion.  Id.  For the 2010 Method, the individual must
present with "[r]epeated manifestations of six or more
[fibromyalgia] symptoms, signs, or co-occurring conditions."
Id. (internal citations omitted).  Applicable conditions include
fatigue, tiredness, non-restorative sleep, memory problems,
depression, anxiety, irritable bowel syndrome, headaches,
numbness or tingling, muscle weakness, abdominal pain, and
gastroesophageal reflux disorder, among others.  Id. at nn.9 &
10.

The record shows that at various times, Sinclair presented with some of those identified manifestations.  The hearing officer identified gastroesophageal reflux disorder and headaches/migraines as non-severe impairments.  Admin. R. 17-18. Sinclair is on medicine for depression.  Id. at 55.  Sinclair reported experiencing fatigue or tiredness.  Id. at 67-68, 738. But see id. at 564 ("She has a sense of fatigue . . . . She thinks she sleeps well.").  Sinclair also underwent a sleep study, but that assessment found that Sinclair does not suffer from sleep apnea.  Id. at 738-40.  In March 2011, Sinclair went to the emergency department at Athol Memorial Hospital, experiencing pain in her left leg, coupled with abdominal and flank pain.  Id. at 387.  Sinclair was diagnosed with kidney stones.  Id.  Otherwise, Sinclair "has no bowel or bladder issues."  Id. at 564, 566.  She testified to concentration issues, id. at 68, which contradicts her treating physician's opinion, id. at 855.  Sinclair also alluded to some numbness in her hands, but she acknowledged that was a recent "issue."  Id. at 65.  Cf. id. at 814 (noting that Sinclair was "[n]egative for . . . numbness").

Sinclair has not carried her burden of proving that fibromyalgia was a medically determinable impairment under the 2010 Method.  Bowen, 482 U.S. at 146 n.5.  Indeed, it would be stretching the record to conclude that Sinclair presented with

at least six fibromyalgia symptoms, especially because "numbness" manifested after the date Sinclair last satisfied the requirements for disability insurance.  Also, her abdominal pain was attributed to kidney stones.  Sinclair attempts to rely on the 1990 Method's "tender points" criterion by inferring that Dr. Harrington must have identified at least eleven positive tender points because he offered fibromyalgia as a possible diagnosis after conducting the tender point examination.  Pl.'s Resp. 1-2.  As noted above, however, Dr. Harrington did not report how many tender points were positive.

The third criterion requires proof that other conditions that could explain these symptoms were considered but refuted. SSR 12-2p.  Sinclair relies on the diagnoses of two treating physicians.  Pl.'s Resp. 2; Pl.'s Mem. 6; Admin. R. 564.  The Commissioner asserts that "neither Dr. Harrington's nor Dr. Funa's diagnosis is enough for [Sinclair] to carry her burden of showing she had the [medically determinable impairment] of fibromyalgia."  Def.'s Mem. 7.  The Commissioner is correct; a diagnosis alone does not satisfy Sinclair's burden at step two. SSR 12-2p.  Moreover, Dr. Funa and Dr. Harrington were treating Sinclair for several other impairments, including chronic back pain, suggesting that other ailments had not been ruled out. Admin. R. 564, 566, 582, 641.

The simple impression or diagnosis of fibromyalgia, without more, does not relieve Sinclair of her burden of proof.  SSR 12-2p.  Although subjective statements are particularly relevant when considering an impairment of fibromyalgia, Sinclair does not report six symptoms delineated in the Agency's fibromyalgia guidance.  Id.  Finally, even if fibromyalgia was a medically determinable impairment, the error was harmless insofar as the hearing officer considered the symptoms associated with Sinclair's fibromyalgia -- namely her chronic back pain -- throughout the evaluation, including in the residual functional capacity determination.  Admin. R. 17, 20.

**B.   Residual Functional Capacity Determination**

Sinclair alleges that the hearing officer's failure to accord Dr. Funa's opinion controlling weight resulted in an incorrect residual functional capacity finding.[8]  Pl.'s Mem. 14-18.  This Court agrees.

The hearing officer determined that Sinclair has a residual functional capacity to perform light work, but she must be able to alter sitting and standing at will.  Id.  In reaching that

---

[8] Although Sinclair also challenges the residual functional capacity finding for failing to account for her sitting and standing limitations, Pl.'s Mem. 4, the Court finds this argument unavailing because the Appeals Council's disability determination depended on the availability of jobs that could all be performed by someone with a restricted sedentary exertional level.

finding, the hearing officer granted only partial weight to Dr. Funa's assessment as to Sinclair's exertional capacity for lifting, carrying, standing, and walking.  Id. at 32.  Whereas Dr. Funa opined that Sinclair could stand or walk for less than two hours in an eight-hour workday and she could occasionally lift ten pounds, id. at 853, the hearing officer concluded that Sinclair could stand and walk for up to two hours and her carrying capacity occasionally was twenty pounds.  Id. at 20.

The residual functional capacity is an individual's ability to do work activities despite her impairments' limiting effects. 20 C.F.R. § 404.1520(d).  The hearing officer assesses whether the medically determinable impairments (identified at step two) "could reasonably be expected to produce the claimant's pain or other symptoms." Admin. R. 20.  Then, the hearing officer "evaluate[s] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." Id.  The residual functional capacity finding is central to steps four and five.

Under the Agency's regulations, the opinions of treating sources merit more weight because the authoring physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [an individual's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical

findings alone." 20 C.F.R. § 404.1527(c)(2).  Where the opinion
pertains to the nature and severity of the claimant's
impairment(s) and is "well-supported by . . . acceptable
. . . diagnostic techniques and is not inconsistent with . . .
other substantial evidence in [the] record, it [is entitled to]
controlling weight."  Id.

In practice, this means that hearing officers often defer
to treating physicians' medical opinions concerning the nature
and severity of the claimant's conditions.  See Vega, 164 F.
Supp. 3d at 256-57.  But see Arroyo v. Secretary of Health &
Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (stating that the
First Circuit "does not require [hearing officer]s to give
greater weight to the opinions of treating physicians" compared
to the opinions of consulting physicians).  Medical source
opinions are particularly informative when making the residual
functional capacity determination.  20 C.F.R. § 404.1527(d)(2).
The hearing officer also uses these opinions when evaluating the
severity and limiting effects of the claimant's symptoms.
§ 404.1527(c)(2); SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  If,
however, the hearing officer does not grant controlling weight
to the treating physician's assessment, she must identify to
what extent the opinion warrants deference, as well as the
factors she considered in reaching that decision.  20 C.F.R.
§ 404.1527(c)(1)-(6).

In concluding that Sinclair "has a sedentary to light work
capacity," the hearing officer accorded only partial weight to
Dr. Funa's residual functional capacity opinion.  Admin. R. 23,
32.  The hearing officer deferred to Dr. Funa's impressions that
Sinclair needed to alternate between sitting and standing at
will and she had no concentration issues.  Id. at 32.  The
hearing officer, however, discounted Dr. Funa's assessment that
Sinclair was only able to stand or walk for less than two hours
and she had a lifting capacity of ten pounds.  Id.

The hearing officer provides four reasons for discounting
Dr. Funa's opinion: (1) inconsistences in the medical record,
(2) inconsistencies with documentary evidence,
(3) inconsistencies with Sinclair's reports of activities of
daily living, id., and (4) physician bias, id. at 32-33.  Of
these four reasons, substantial evidence only reinforces the
first (inconsistency with medical evidence).  Given the
pervasive impact that medical opinions have in the five-step
analysis, each of the hearing officer's justifications is
discussed in detail.

### 1.    Inconsistencies with the Medical Evidence of Record

In her written opinion, the hearing officer carefully
summarizes Sinclair's visits with medical professionals and
recounts doctors' observations that appear to contradict both

Sinclair's alleged pain level and the extreme limitations Dr. Funa identified in the medical source statement. Id. at 24-32. Notably, "a patient's reports of complaints or history, is an essential diagnostic tool in fibromyalgia cases, and a treating physician's reliance on such complaints hardly undermines his opinion as to [the patient's] functional limitations." Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009) (internal quotation marks omitted). But objective medical evidence conflicts with Sinclair's alleged limitations and Dr. Funa's medical source determination. See 20 C.F.R. § 404.1527.

For example, in March 2011, Sinclair rated her back pain at a six out of ten, while her doctor observed that she sat "quite comfortably with her legs crossed and bend[ed] forward easily." Admin. R. 590. In June 2012, when Sinclair claimed that her bilateral heel pain was so debilitating that she could not even walk, her doctor only observed minor inflammation (eczema) and "no evidence of deep crevices and cracks." Id. at 574.

Sinclair returned to Winchendon Health Center in February 2013, at which point Dr. Harrington provided an impression of fibromyalgia. Id. at 564. At the bottom of his visit summary, Dr. Harrington dictated that he "[d]iscussed the implications of fibromyalgia. Advised exercise as important part of treatment. Advised that this should not be disabling." Id. Presumably, the hearing officer interpreted Dr. Harrington's notes as

[22]

relating to the impression of fibromyalgia, meaning that Dr. Harrington's comment that "this should not be disabling" qualifies Sinclair's fibromyalgia.  Id. at 28.  Given the short summary of this patient visit, it is unclear whether the advised exercise comment and non-disabling hypothesis pertain to fibromyalgia or the other impressions Dr. Harrington identified (migraine syndrome and hypertension).  See 2 Attorney's Medical Deskbook § 24:4 ("A regular exercise program reduces hypertension.").  Resolving such uncertainty, however, is a task for the hearing officer, not this Court.  Accepting the hearing officer's interpretation, the extreme limitations Dr. Funa identified in his residual functional capacity opinion are inconsistent with Dr. Harrington's assessment.

Moreover, the Medical Source Statement form that Dr. Funa completed requests that if the physician selects the most debilitating levels -- as Dr. Funa did here -- then the physician also explain that choice by providing "the precise limitation" causing the extreme restriction identified.  Admin. R. 853.  Yet Dr. Funa offers no such elaboration.  Id.  Dr. Funa's omission is not fatal to his medical source opinion, but it does limit its usefulness.  See 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."); Smith v. Astrue, 359 F. App'x 313, 316 (3d Cir. 2009)

[23]

("[C]hecklist forms . . . which require only that the completing
physician check a box or fill in a blank . . . are considered
weak evidence at best . . . ." (internal quotation marks
omitted)).  The hearing officer did not discount Dr. Funa's
opinion for failing to explain the exertional implications he
identified, and the hearing officer did not claim that she did
not understand Dr. Funa's factual basis for selecting the most
restrictive limitations.  Rather, the hearing officer
appropriately made a credibility determination that Dr.
Harrington's evaluation was more consistent with the record as a
whole.  See Conte v. McMahon, 472 F. Supp. 2d 39, 49 (D. Mass.
2007).

        The hearing officer also submits that Sinclair's symptom
relief indicates medical inconsistencies with the severe
limitations about which Dr. Funa opined.  Specifically, the
medical evidence "revealed . . . improvement in symptoms of
plantar fasciitis and no need for back surgery or constant need
for assistive devices such as a cane, walker, or wheelchair."
Admin. R. 32.  In January 2013, Sinclair's plantar fasciitis
"continue[d] to improve despite weaning off the cam walker and
going back to regular shoes." Id. at 709.  A month later,
Sinclair returned to using her walking boot, id. at 708, but
transitioned back to regular shoes with foot straps after a
week, which "helped quite a lot," id. at 706.  A review of the

record shows that there is substantial evidence supporting the hearing officer's claim that Sinclair did not need the constant assistance of walking devices.

In regard to Sinclair's lower back pain, the hearing officer notes that Sinclair did not need back surgery and Sinclair's pain was controlled with medicine.  Id. at 32. Despite Sinclair's complaints of chronic pain in her lower back, treating physicians do not document any back abnormalities.  Id. at 24-25.  This suggests, as the hearing officer concluded, that Sinclair did not need back surgery.  Further, the medical evidence shows that physical therapy, id. at 757, and medicine relieved Sinclair's back pain, id. at 578, 640.  Sinclair herself reported that "[h]er back pain has been manageable." Id. at 600.

Often, Sinclair's visit records indicate that she was in no acute distress and that her pain was manageable.  As the hearing officer suggests, "[g]iven [Sinclair]'s allegations of totally disabling symptoms, one might expect to see more indication in the treatment records of restrictions . . . ."  Id. at 27.  The same logic supports the hearing officer's assertion that Dr. Funa's functional capacity assessment was inconsistent with the medical evidence.  In sum, the hearing officer's assertion that Sinclair's symptoms improved is a permissible reading of the record.  See Lizotte, 654 F.2d at 128.

###           2.     Inconsistencies with Documentary Evidence and
                Sinclair's Testimony, and Physician Bias

The hearing officer's second reason for discrediting Dr.
Funa's opinion was its inconsistency with documentary evidence.
Id. at 32.  Yet, the hearing officer does not refer to specific
evidence in the record or elaborate on this justification.
Elsewhere in her decision, the hearing officer cites to field
officer reports as documentary evidence.  Id. at 21.  But the
field officer confirms, rather than contradicts, the exertional
limits Dr. Funa opined.  After meeting Sinclair for an initial
interview, the field officer observed that Sinclair had "many
health problems, back pain during 1 h[ou]r long interview, had
problems sitting in chair, also her feet hurt, [and] had
problems walking after interview."  Id. at 254.  Without
specific references to the record, it is unclear to the Court
upon what inconsistencies with documentary evidence the hearing
officer relied.  Given this uncertainty the Court hesitates to
speculate what other documentary evidence the hearing officer
found inconsistent with Dr. Funa's opinion.

The hearing officer's third reason for giving little weight
to Dr. Funa's opinion was that it was inconsistent with
Sinclair's hearing testimony.  Id. at 32.  This is too narrow a
reading of the record.  The hearing officer relies on Sinclair's
testimony about her ability to partake in many activities of

daily living.  Id. at 21, 52-54.  Contrary to the hearing

officer's justification, Dr. Funa's opinion and Sinclair's

testimony are consistent regarding exertional limits on

standing, walking, carrying, and lifting (the same actions from

Dr. Funa's statement that the hearing officer discredited).  See

Vega, 164 F. Supp. 3d at 257 (acknowledging that the hearing

officer parsed the claimant's statement, but that the claimant's

full statement does not appear inconsistent with the treating

physician's opinion).  While Sinclair testified that she could

perform some activities of daily living, she explained that

"even doing simple tasks was really painful."  Admin. R. 52.

Sinclair also testified that she could only walk or stand in one

place for approximately twenty to thirty minutes.  Id. at 65.

In her function report, Sinclair acknowledged that she goes

grocery shopping once a week for one hour.  Id. at 273.  Thus,

the time duration Sinclair testified to, and her one-hour

grocery excursions, match -- rather than contradict -- Dr.

Funa's opinion that Sinclair could stand or walk for less than

two hours.  Id. at 853.  Sinclair also reported that she could

lift only ten pounds.  Id. at 275.  During the hearing, Sinclair

testified that she could carry between five and eight pounds.

Id. at 64.  Again, this testimony reaffirms Dr. Funa's

assessment that most of the time Sinclair's carrying capacity

was restricted to less than ten pounds.  Id. at 853.  Given the

consistency between Dr. Funa's opinion and Sinclair's testimony, the hearing officer's justification that there are inconsistencies between the two is unsubstantiated.

This leaves the hearing officer's final reason: the possibility that Dr. Funa's assessment might have been an "advocacy opinion," rather than a medical one.  Id. at 32-33. The hearing officer ruminates that Dr. Funa may have relented to Sinclair's persistent requests for "supportive notes," which is "more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case."  Id.  But that situation is not the case here, where reasonable minds could differ as to whether Dr. Funa's opinion is inconsistent with the medical record.  Further, the hearing officer's final residual functional capacity determination does not differ significantly from the limitations Dr. Funa reported, suggesting that Dr. Funa's opinion does not substantially contradict the record.

Interestingly, a different hearing officer made identical statements in a Social Security opinion appealed to the district court in Maine.  Gagnon v. Colvin, No. 1:15-CV-273-DBH, 2016 WL 403063, at *3-4 (D. Me. Jan. 13, 2016), report and recommendation adopted, No. 15-CV-273-DBH, 2016 WL 409674 (D. Me. Feb. 2, 2016).  There, the court found that although the hearing officer cited other evidence for rejecting the

[28]

physician's opinion, those reasons could "not overcome her bias, unsupported by record references, displayed in her speculative remark about [the treating physician]'s possible motivation." Id. at *4.  This is true here as well.

Not only did the hearing officer make this bold assumption without pointing to evidence in the record that suggests Dr. Funa had an improper motive, but the record also does not support the two other justifications.  Therefore, the hearing officer erred by assigning little weight to Dr. Funa's opinion without an adequate explanation for doing so.

Accordingly, the hearing officer's residual functional capacity finding, which depended on the limited weight accorded to Dr. Funa's opinion, was flawed.  The testimony of the vocational expert based on this finding was thus flawed as well -- because "the hearing officer transmitted a flawed residual functional capacity to the vocational expert, [her] reliance on the vocational expert's testimony is misplaced."  Vega, 164 F. Supp. 3d at 262.  On this basis, the Court remands the matter for further proceedings.

### C.   Outdated Dictionary of Occupational Titles

Sinclair contends that the hearing officer's reliance on the vocational testimony was also improper because that testimony was based on the Dictionary of Occupational Titles, which is outdated.  Pl.'s Mem. 16-17.  The Commissioner counters

[29]

that the Agency takes administrative notice of the Dictionary as a reliable government publication.  Def.'s Mem. 20; 20 C.F.R. § 404.1566(d).

"Courts have repeatedly expressed concern about a [hearing officer]'s reliance on obviously outdated [Dictionary] occupations at step five.  While the last publication of the [Dictionary] was in 1991, the last significant update of the occupation information it contains occurred with the 1977 edition."  Boston v. Colvin, No. 4:14-CV-206-D, 2016 WL 721563, at *15 (E.D.N.C. Feb. 2, 2016), report and recommendation adopted, No. 4:14-CV-206-D, 2016 WL 738762 (E.D.N.C. Feb. 23, 2016).  Without guidance from the First Circuit, this Court harbors that same concern.  The Court, however, finds solace in how other courts have considered disability appeals in the context of archaic job descriptions.  By incorporating common sense into the analysis, the Court rules that the other jobs enumerated by the vocational expert exceed Sinclair's abilities.  Thus, the vocational expert's testimony is unreliable for two reasons: (1) it is based on a flawed residual functional capacity determination and (2) it overlooks the reality that jobs have changed over the past forty years.  These errors warrant remand.

Other courts similarly have remanded Social Security appeals where, as is the case here, more current job

descriptions raise doubts about the vocational expert's (and by
extension, the hearing officer, Appeals Council, and
Commissioner's) reliance on the Dictionary.  See, e.g., Dimmett
v. Colvin, 816 F.3d 486, 490 (7th Cir. 2016) (characterizing the
reliance on the Dictionary's obsolete job descriptions as a
weakness in the vocational expert's testimony which was
subsequently "rubber stamp[ed] by the magistrate and district
judges"); Cunningham v. Astrue, 360 F. App'x 606, 616 (6th Cir.
2010) (remanding the matter "for consideration of whether the
DOT listings, specifically [for the proffered job alternatives],
were reliable in light of the economy as it existed at the time
of the hearing before the [hearing officer]"); Boston, 2016 WL
721563, at *17-18 (finding that the lack of vocational testimony
about job descriptions speaks to the conclusion that the
ultimate disability determination was not supported by
substantial evidence); see also English v. Shalala, 10 F.3d
1080, 1085 (4th Cir. 1993) (remanding because the Administration
relied on the outdated third edition of the DOT, which was
substantially different from the fourth edition).  Contra Malfer
v. Colvin, No. CIV.A. 12-169J, 2013 WL 5375775, at *5 (W.D. Pa.
Sept. 24, 2013) ("[E]ven if the [vocational expert]'s testimony
was in conflict with O*NET, there is no requirement that the
. . . testimony comply with that database.  Instead, the
[vocational expert]'s testimony must comply with the DOT

[31]

. . . ."); <u>Ryan</u> v. <u>Astrue</u>, 650 F. Supp. 2d 207, 218 (N.D.N.Y.
2009).

### 1.    Administrative Notice of Publications

The Commissioner makes two arguments that are the flip side
of the same coin.  Def.'s Mem. 20.  The Commissioner asserts
that the Agency takes administrative notice of the DOT, <u>id.</u>
(citing Social Security Ruling (SSR 00-4p), Titles II and XVI:
Use of Vocational Expert and Vocational Specialist Evidence, and
Other Reliable Occupational Information in Disability Decisions,
65 Fed. Reg. 75,759 (Dec. 4, 2000)), but has not taken
administrative notice of the Occupational Information Network
("O*NET"), <u>id.</u> (citing 20 C.F.R. §§ 404.1556(d)).

Sinclair argues that taking administrative notice of some
publications does not mean others are not also useful.  Pl.'s
Resp. 5.  Indeed, the regulations introduce these publications
as examples.  20 C.F.R. § 404.1556(d).  Thus, this list is
neither exhaustive nor exclusive, so the Commissioner's claim
falls flat.  <u>See</u> <u>Donahue</u> v. <u>Barnhart</u>, 279 F.3d 441, 445 (7th
Cir. 2002) ("The Dictionary is published by the Department of
Labor as a tool; it does not purport to contain rules of law,
and no statute or regulation gives it binding force."); <u>Davis</u> v.
<u>Apfel</u>, 149 F. Supp. 2d 99, 108-09 (D. Del. 2001) ("[N]o one
dictionary serves as the binding authority on job
descriptions.").  Additionally, "[i]nformation contained in the

DOT is not conclusive evidence of the existence of jobs in the national economy; however, it can be used to establish a rebuttable presumption." English, 10 F.3d at 1085.

Moreover, the Commissioner does not claim that O*NET is not a reliable government publication.  If O*NET is reliable enough for the author of the Dictionary, the Department of Labor, to use, it seems nonsensical that O*NET is unreliable for the Administration's purposes.  See Ricard v. Astrue, No. 1:09-0008, 2009 WL 5031317, at *9 ("Although considered obsolete by most other federal agencies, the DOT continues to be used extensively by the Social Security Administration, although plans to replace the DOT as the Administration's primary vocational reference source are underway.").  Other courts have determined that until the Administration publishes an updated job classification manual, O*NET job descriptions are useful.  See, e.g., Dimmett, 816 F.3d at 489 ("[The] Administration, while aware of the obsolescence of the Dictionary . . . , hasn't endorsed the O*NET and . . . is developing its own parallel classification system. But this system is not expected to be rolled out for at least three more years, leaving a vacuum that the O*NET may fill.").

### 2.   Analogous Job Descriptions

In Feeley v. Commissioner of Social Security, No. 14-4970, 2015 WL 3505512 (D.N.J. June 3, 2015), the claimant presented the same argument that Sinclair offers to this Court: the

Appeals Counsel relied on an outdated publication when determining that Sinclair was able to perform other jobs existing in significant numbers in the national economy. Sinclair's vocational expert, Meuse, asserted that the job descriptions available in the DOT are out-of-date, and the jobs the vocational witness identified are either extinct or, if they still exist, are "more sophisticated" than the Dictionary's antiquated descriptions.[9]  Admin. R. 361-63.

Sinclair also points out that the Agency imposes a fifteen-year limit on past work such that at step four the "relevant" past work means that the claimant did that work within the last fifteen years.  Pl.'s Mem. 16-17.  According to the Agency's regulations, "[a] gradual change occurs in most jobs so that after [fifteen] years it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply.  The [fifteen]-year guide is intended to insure that remote work experience is not currently applied."  20 C.F.R.

_____

[9] Sinclair similarly disputes the job incident numbers stated by the vocational expert, because the Bureau of Labor Statistics groups incident numbers together into major occupational categories.  Pl.'s Mem. 15.  This is not a cause for concern here, however, because the vocational expert provided more than just raw numbers.  She explained that -- based on her thirty years of extensive experience -- she had adjusted the incident numbers to exclude any inappropriate jobs, Admin. R. 76, and further reduced the number to accommodate Sinclair's sit-stand limitation, id. at 73.

§ 404.1565(a).  Common-sense allows the Court to conclude that if jobs change enough in fifteen years to make consideration of that work experience unsuitable at step four, those same changes over fifteen years impact the skills and abilities required for "other jobs" at step five.  Following this reasoning, Sinclair argues that the recommended "other jobs" are classified today as skilled or semi-skilled positions with correspondingly higher SVP levels, disqualifying those jobs as options for Sinclair. Admin. R. 361–63; Pl.'s Resp. 7–8.

The analysis conducted in Feeley incorporates the reality that the natural progression of time has on employment. Furthermore, of the three job alternatives delineated in Feeley, 2015 WL 3505512, at *3, the vocational expert at Sinclair's hearing identified two as options for Sinclair: telephone quotation clerk and charge account clerk.  Admin. R. 74 (using the job titles of telephone clerk and office clerk instead of telephone quotation clerk and charge account clerk, respectively).  Given the overlap of vocational testimony for these two disability claims, reciting the district court's analysis in Feeley is informative.

First, the district court evaluated the Dictionary's description for the proffered positions to assess whether those descriptions are outdated.  Feeley, 2015 WL 3505512, at *10–12. The court began with the telephone quotation clerk position.

Id. at *10.  According to the Dictionary, that job involves
"[a]nswer[ing] telephone calls from customers requesting current
stock quotations . . . ."  Dictionary of Occupational
Titles, 237.367-046, 1991 WL 672194.  Based on this definition,
the Feeley court stated:

> The notion of an investor calling his brokerage house
> on the telephone to have a stock quotation read to him
> by a receptionist who monitors an "electronic quote
> board" does seem rather quaint.  I am sure that it
> still occurs.  Nevertheless, the [v]ocational
> [e]xpert's testimony that in 2012 there were
> approximately 970,000 telephone quotation clerk jobs
> available nationally, and 95,000 available regionally,
> seems dubious.

Feeley, 2015 WL 3505512, at *10.  The district court then
acknowledged that the Department of Labor uses O*NET, which
"seems to have replaced the Dictionary . . . ."  Id. at *10 &
n.2.  Considering that the Department itself uses O*NET, the
district court suggested that "the [Administration] may wish to
reconsider its persistent reliance on the [Dictionary] in
disability proceedings."  Id. at *10 n.2.

Recognizing that the Department of Labor uses O*NET because
it is more current than the DOT, the district court noted that
there is no telephone quotation clerk position in O*NET.  Id. at
*10.  After searching O*NET to determine whether this position
was simply re-labeled, the court discovered that the "O*NET-
equivalent" is titled "Receptionists and Information Clerks."
Id.  But the district court opined that the receptionist job

[36]

description was "not a close enough fit to permit . . . carry[ing] over the old DOT category to the O*Net era." Id. Further, because the vocational expert did not testify as to whether Feeley could be a general receptionist, the court would not assume Feeley could perform this job. Id. The district court acknowledged that "[w]ere this the only job category that the [hearing officer] had found Feeley could perform, a remand might well be appropriate." Id. at *11. But, the court explained, the other two job alternatives were not obsolete and existed in significant numbers, thus the hearing officer's step five determination was supported by substantial evidence. Id.

The Feeley court then considered the role of charge account clerk (synonymous with office clerk). After providing the Dictionary's description of a charge account clerk, Dictionary of Occupational Titles, 205.367-014, 1991 WL 671715, the district court concluded that it "does not unlock memories of the Reagan era. Nothing about [it] is inconsistent with the internet age . . . ." Feeley, 2015 WL 3505512, at *11. The court determined that "interviewers" was the corresponding O*NET position. Id. at *12.

The Court adopts the district court's conclusions in Feeley for the positions of telephone clerk and office clerk, leaving only the job of table inspector for this Court to analyze. That position involves "[e]xamin[ing] squares (tiles) of felt-based

linoleum material passing along on conveyor and replac[ing]
missing and substandard tiles." <u>Dictionary of Occupational
Titles</u>, 739.687-182, 1991 WL 680217.  Table inspector is not
included in O*NET.  There also does not appear to be an O*NET-
equivalent as the jobs with similar descriptions have more
requirements.  As there are additional duties associated with
the O*NET counterparts, these positions are characterized by an
SVP of more than four.  For example, Packaging and Filling
Machine Operators and Tenders "[o]bserve machine operations to
ensure quality and conformity of filled or packaged products to
standards," but this position also sorts and inspects products
and adjusts machinery to meet specifications.  <u>Summary Report
for: 51-9111.00 – Packaging and Filling Machine Operators and
Tenders</u>, O*NET Online, Dep't Lab., Emp. & Training Admin.,
www.onetonline.org/link/summary/51-9111.00 (last updated 2016).
Just as the contemporary position for telephone clerk is "not a
close enough fit to permit . . . carry[ing] over the old DOT
category to the O*Net era," nor is the modern-day equivalent of
a table inspector.  <u>Feeley</u>, 2015 WL 3505512, at *10.

 Only one of the three jobs offered by the vocational expert
at Sinclair's hearing survives the <u>Feeley</u> analysis.[10]  Even the

_____

 [10] Although this Court refers to this as "the <u>Feeley</u>
analysis," other district and circuit courts have adopted the
approach where the court applies common sense to demonstrate

analogous position for charge account clerk, however, is inapplicable to Sinclair because the preparation and skill levels exceed Sinclair's capabilities.  As noted above, Sinclair is an unskilled worker, which corresponds to an SVP of two.  The Department of Labor assigned an SVP rating between four and six to the position of "interviewer."  This suggests that while the proffered job alternative for charge account clerk is not obsolete, Sinclair could not do it as it is performed today. Therefore, the Appeals Council erred in relying on these job alternatives (or the vocational expert's testimony based on them) to reach its step five conclusion.  See Dimmett, 816 F.3d at 489 ("[B]oth the [hearing officer], in uncritically accepting the vocational expert's testimony, and the vocational expert, in failing to understand the requirements of the jobs he mistakenly thought the plaintiff capable of performing, appear to have ignored the most current manual of job descriptions -- the O*NET.").

## V.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is VACATED, and the matter is REMANDED to the hearing officer for further proceedings consistent with this memorandum and order.

---

that the DOT's job descriptions are antiquated.  See, e.g., Dimmett, 816 F.3d at 489-90; Alaura v. Colvin, 797 F.3d 503, 507-08 (7th Cir. 2015); Cunningham, 360 F. App'x at 615-16.

On remand, the hearing officer should clarify her reasons for discounting Dr. Funa's opinion, or, alternatively, give Dr. Funa's assessment controlling weight and modify the residual functional capacity accordingly.  In light of this Court's determination that a remand is warranted, new vocational expert testimony based on the appropriate residual functional capacity finding will likely be needed.  The Court also requires that the hearing officer revisit the vocational expert's opinion regarding the availability of jobs existing in the national and regional economies.  Sinclair's motion to reverse is GRANTED to the extent that the Court orders the alternative relief sought in her memorandum.  The Commissioner's motion to affirm is DENIED.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

**APPENDIX: VOCATIONAL TESTIMONY HYPOTHETICALS TABLE**

The hearing officer's hypotheticals, "Hypo 1," "Hypo 2," and "Hypo 3," can be found in the record at 71-74.  The hypothetical crafted by Sinclair's attorney, "Sinclair Att'y Hypo," is in the record at 75-76.  "Funa Opinion" is provided for comparative purposes and is derived from Dr. Funa's Medical Source Statement at 853-56.

| Functional Limitations | | Funa Opinion | Hypo 1 | Hypo 2 | Hypo 3 | Sinclair Att'y Hypo |
|---|---|---|---|---|---|---|
| Lift/ Carry | Occasion | 10 lbs | 20 lbs | 20 lbs | 20 lbs | 20 lbs |
| | Frequent | <10 lbs | 10 lbs | 10 lbs | 10 lbs | 10 lbs |
| Stand/ Walk | | <2 hrs | 6 hrs | 2 hrs | 2 hrs | 6 hrs |
| Sit | | | 6 hrs | 6 hrs | 6 hrs | 6 hrs |
| Alter Sit/ Stand | | Yes | Yes | Yes | Yes | Yes |
| Overhead Reach | | Unlimited | Occasion | None | None | Occasion |
| Lay Down | | | | | 1 hr + normal breaks | |
| Stoop, Kneel | | Occasion | Occasion | Occasion stoop; no crouch/ kneel | Occasion stoop; no crouch/ kneel | Occasion |
| Climb Stairs | | Never | Yes | Occasion | Occasion | Yes |
| Push/ Pull | Occasion | Limited | 20 lbs | 20 lbs | 20 lbs | 20 lbs |
| | Frequent | Limited | 10 lbs | 10 lbs | 10 lbs | 10 lbs |
| Lack Focus | | None | | | | 25% of time |
| Absences/ month | | | | | up to 3 | |
| **Vocational Testimony (other jobs)** | | | Information Clerk; Office Helper; Inspector | Telephone Clerk; Office Clerk; Table Inspector | None | None |

[ 41 ]